# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Jan 12, 2026

| | |
|---|---|
| IN RE:<br><br>ANGELA SUZANNE LANDRUM-ELLIS,<br><br>       Debtor. | Case No. 24-11653-T<br><br>Chapter 7 |
| STERLING OAKS LAW FIRM, PLLC,<br><br>       Plaintiff,<br><br>v.<br><br>ANGELA SUZANNE LANDRUM-ELLIS,<br><br>       Defendant. | Adv. No. 25-01005-T |

## MEMORANDUM OPINION

Plaintiff is a law firm that represented Defendant in a divorce action and separate civil matter in state court. Defendant was unable to pay for the legal services upfront and made various promises, both implicit and explicit, to pay Plaintiff's fees at some point in the future. At issue here is the nature, enforceability, and reliability of those promises, as well as the dischargeability of the debt when Defendant eventually sought relief under the Bankruptcy Code. After a trial on the merits, where the Court heard argument, received evidence, and had the opportunity to observe the credibility and demeanor of the Defendant, the Court finds Plaintiff has not made the required showing to find its debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).[1] The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052.

---

[1] Trial held October 21, 2025 (the "Trial"). *See* ECF No. 16. Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

**Jurisdiction**

The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. § 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of the bankruptcy case is proper pursuant to 28 U.S.C. § 157(a). The determination of the dischargeability of a particular debt is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(I).

**Findings of Fact**

Sterling Oaks Law Firm, PLLC ("Plaintiff"), is an Oklahoma company formed by and 100% owned by attorney Deborah A. Reed ("Reed") under which she performs legal services. Plaintiff is the successor company of Reed Legal, PLLC, a company also formed by and 100% owned by Reed. All clients represented by Reed under Reed Legal, PLLC became clients of Plaintiff in 2020.[2]

Angela Suzanne Landrum-Ellis ("Defendant") is a public-school teacher. In 2019, Defendant hired Plaintiff to represent her in two cases pending in the District Court for Tulsa County, Oklahoma.[3] Defendant's previous counsel in those matters had withdrawn due to lack of payment. According to Plaintiff, substantial judgments in the contract dispute matter had been entered against Defendant immediately prior to Plaintiff's engagement.[4] Plaintiff was aware of Defendant's financial struggles prior to being hired, and "was concerned about [Defendant]'s

---

[2] Going forward, all references to "Plaintiff" will refer to Reed Legal, PLLC, Sterling Oaks Law Firm, PLLC, or Reed, depending on the nature of the reference and when the services were performed.

[3] These were Defendant's divorce proceeding and a civil contract dispute. *See* Plaintiff's Ex. 1.

[4] *See* Complaint, ECF No. 1, at 3 ¶ 11. Defendant generally denied all allegations in the Complaint except those that were specifically admitted, as allowed by Fed. R. Civ. Proc. 8(b)(3), made applicable to this proceeding by Fed. R. Bankr. Proc. 7008. *See* ECF No. 6, at 1. This statement was not admitted by Defendant, but is included here because it weighs on the state of mind and knowledge possessed *by the Plaintiff*, as discussed below.

ability to pay the legal fees required in these cases due to the nature of the cases."[5] As a result, Plaintiff included the following statement in an engagement letter dated October 16, 2019 (the "Engagement Letter"): "You agree to pay any monies owed from any court ordered disbursement of retirement plans, and also agree to affirm any legal fee debt to attorneys, in the event you have to file for bankruptcy."[6] Plaintiff made no specific allegation in the Complaint or Pre-Trial Order, nor did it offer evidence at Trial, that Defendant ever executed or otherwise explicitly adopted the terms of the Engagement Letter.[7] The first invoice generated by Plaintiff in Defendant's legal matter (the "First Invoice") included the statement: "DUE AT SETTLEMENT We have agreed to be compensated for our fees when funds or assets from the marital estate (if any) are disbursed to you, and/or you make arrangements to make payments over time."[8]  Again, there is no allegation or evidence that Defendant explicitly endorsed or otherwise adopted this statement contained in the First Invoice.

During the course of the representation, Plaintiff continued to express concerns about

---

[5] *See* ECF No. 1, at 3 ¶ 12.  *See supra* note 4. This statement was not admitted by Defendant, but the Court finds it constitutes *a statement by Plaintiff* about *Plaintiff's* state of mind at the time of the legal engagement.

[6] *See* ECF No. 1, at 3 ¶ 12. *See supra* note 4. This statement was not admitted by Defendant. Nor was the Engagement Letter offered as evidence at Trial. The Court includes the alleged terms of the Engagement Letter solely to facilitate the discussion below regarding the enforceability of such pre-bankruptcy contract provisions.

[7] *See* ECF No. 1; Pre-Trial Order, ECF No. 11. Plaintiff appears to mistakenly believe that statements in previously filed documents regarding the Engagement Letter will be considered as evidence by the Court. Based on a request of Plaintiff made at Trial, the Court has taken judicial notice of pleadings filed in Case No. 24-11653, Defendant's main bankruptcy case. In a document titled "Creditor's Objection to Discharge of Debt," filed in Case No. 24-11653, ECF No. 16 (the "Creditor's Objection"), Plaintiff quoted the above language from the Engagement Letter. Because the Creditor's Objection sought to exempt a debt from discharge, it had no legal consequence when filed in the Defendant's main bankruptcy case; such an action must be filed as an adversary proceeding. *See* Fed. R. Bankr. P. 7001.  Because the Creditor's Objection was a legal nullity, Defendant was not required to file any type of answer or response. Therefore, Defendant cannot be held to any admission or waiver of rights for failing to respond to the Creditor's Objection.

[8] Invoice dated November 15, 2019, Plaintiff's Ex. 3, at 1.

Defendant's ability to pay for the firm's legal services. At Trial, Reed indicated that Defendant had asked her for the name of a bankruptcy attorney as early as 2020. On April 28, 2021, Reed sent an email to Defendant stating "Unless you can start paying on your legal fees, we can't stay in both cases. Since you're not working, I don't see how that will be possible."[9] At Trial, Reed stated that she did not become concerned about Defendant's ability to pay Plaintiff's legal fees until 2022.  This is belied by the terms of the Engagement Letter and Plaintiff's subsequent email communications.

Over the course of their engagement, Plaintiff accrued $67,306.89 in fees and an additional $20,124.90 owed to a contract attorney who worked on Defendant's matter.[10] Plaintiff presented Defendant with monthly invoices from November 15, 2019, to April 15, 2024, with the last fees billed on March 8, 2024.[11] In her closing argument at Trial, Reed indicated Defendant made three payments to Plaintiff in 2022, without specifying the amounts. Jeri Yeary, a manager of Plaintiff, testified that Defendant made "four or five" payments of approximately $250 each to Plaintiff in 2023.  In her closing brief, Plaintiff represented that Defendant made five payments totaling $950.[12]

In various email exchanges regarding payment, Defendant made the following statements to Plaintiff:

---

[9] Plaintiff's Ex. 7, at 2.
[10] ECF No. 1, at 1 ¶ 2.
[11] *See* Plaintiff's Ex. 3 (Invoice Nos. 11127 & 11600).
[12] Post-Trial Brief, ECF No. 17, at 7.

| April 28, 2021, 4:23 PM: | You know I would rather keep you retained than go through the process of bringing on another attorney.<br><br>You are up to speed and well versed in the case. How can I convince you to stay on with the [contract dispute] matter? |
|---|---|
| April 28, 2021, 4:35 PM: | [*in response to an email from Reed demanding payment*]<br><br>I'm confused, Aren't you about to receive the balance paid in full from [ex-husband's retirement] withdrawal? That would put us at $0 working forward. . . . I am working, I have started a new career, which we talked about, commission based. It will just take some time to work into that creating a steady stream of income. |
| April 28, 2021, 4:50 PM: | I've been able to pay off a few credit cards with the little I've been making, I can budget something to your firm. And it will grow as my income grows. |
| March 26, 2024: | [*after a lengthy description of many ongoing financial challenges*]:<br><br>IF, I am forced to file bankruptcy to alleviate my debts, I will ***still*** create a payment plan for my debt to you. I am still in a state of flux and not in a position to begin anything as of yet.<br><br>I am actively pursuing higher-paying positions within the realm of education and know I will be awarded something soon that will put me in a better position financially. I will not leave you high and dry. |
| May 18, 2024 | [*in response to an email from Reed stating: "I am getting ready to file for a judgment against you for attorney fees. I really don't want to do that. This is my final notice before I file."*]<br><br>I have full intentions of paying my fees to you when this case is settled and I am settled!<br><br>[*followed by a description of ongoing financial challenges*].<br><br>My dad has always said, you can't squeeze blood from a turnip. My teaching salary does not leave me any extra right now.<br><br>I have not filed bankruptcy, I have kept my word in that regard, and will keep my word in good faith of payment as well. |

Defendant's divorce was finalized in late 2023. Under its terms, Defendant received a payment from her ex-husband's retirement account in mid-2024. Defendant testified that she used some of those funds to put a downpayment of $50,000 on a new home in June 2024. She has since spent additional funds to make needed improvements to the new home. The remainder of the

divorce settlement funds "remains invested." None of the funds were paid to Plaintiff.

Despite her financial struggles throughout the two legal proceedings, Defendant testified that she did not consider filing for bankruptcy relief until early 2024. On June 17, 2024, Defendant was ordered to pay $123,024.44 in legal fees to her ex-husband in the divorce case.[13] Defendant also received notice of a substantial tax debt to the Oklahoma Tax Commission related to the contract dispute matter.[14] These unexpected expenses, in addition to other debt she had accumulated during her divorce, caused Defendant to feel overwhelmed and eventually led her to seek out counsel to begin the process of filing for relief under the Bankruptcy Code. She filed for relief under Chapter 7 on December 13, 2024.

To the extent the "Conclusions of Law" contain any items that should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Burden of Proof

The issue before the Court is whether a debt should be excepted from discharge under § 523(a)(2)(A) of the Bankruptcy Code. Exceptions to discharge are to be narrowly construed in favor of the debtor so as to promote the "fresh start" policy of the Bankruptcy Code.[15] Under § 523, a creditor seeking to except its claim from discharge must prove the claim is nondischargeable by a preponderance of the evidence.[16]

---

[13] *See* Defendant's Ex. 1.

[14] *See* Defendant's Ex. 4 (showing $29,650.44 owed to OTC as of May 9, 2025).

[15] *Bellco First FCU v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997); *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 782 (10th Cir. BAP 1998).

[16] *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

## Conclusions of Law

The Bankruptcy Code prevents debtors from discharging liabilities incurred as a result of their own fraud, reserving relief to the "honest but unfortunate debtor."[17] Section 523(a)(2) excepts from discharge "any debt . . . for money, property, or services, or an extension, renewal, or refinancing of credit, to the extent obtained by" fraud.[18] The statute is further broken down into subparagraph (A), which bars discharge of debts arising from "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition," and subparagraph (B), which bars discharge of debts arising from a materially false "statement . . . respecting the debtor's . . . financial condition" if that statement is "in writing."[19]

Section 523(a)(2)(A) refers to three different types of fraud—false pretenses, false representation, and actual fraud—which must be analyzed separately depending on the facts of the specific case.[20] Each of those terms "carr[ies] the acquired meaning of terms of art. They are common-law terms, and . . . they imply elements that the common law has defined them to include."[21] A plaintiff need only prove one type of fraud to meet its burden under subparagraph (A). Common to each type of fraud is a requirement of positive fraud, i.e., "those frauds involving moral turpitude or intentional wrong, and does not extend to fraud implied in law which may arise

---

[17] *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998); *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 715 (2018).

[18] § 523(a)(2).

[19] *Id*.

[20] *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 ("It is therefore sensible to start with the presumption that Congress did not intend 'actual fraud' to mean the same thing as 'a false representation[.]'").

[21] *Field v. Mans*, 516 U.S. 59, 69 (1995). *See also Ritz*, 578 U.S. at 360.

in the absence of bad faith or immorality."[22] The crucial question in all cases under § 523(a)(2)(A) is whether there was some scheme to defraud another party.[23]

There are effectively two separate representations made by Defendant at issue in this matter: one enforceable, one not.  First is a simple promise inherent in any agreement to extend credit for services: by accepting Plaintiff's performance of legal services, Defendant represented that she intended to pay for those services.  Such promises are regularly enforced as breach of contract actions. Second is a representation that Defendant would, if circumstances required her to file a bankruptcy case, offer special treatment to Plaintiff and take measures to ensure that its debt was not subject to the general discharge offered under the Bankruptcy Code.  For reasons discussed below, courts will not enforce such a promise.

### 1.  *A prepetition waiver of discharge is unenforceable and void as against public policy.*

Because it is the easiest to address, and the most concerning aspect of this case, we start with Plaintiff's allegation that Defendant made a representation at the outset of their engagement that she would waive certain exemption rights and her right to a discharge in the event she filed for bankruptcy protection.[24]  Although no evidence was presented that Defendant made such a representation explicitly, language to that effect was included in the Engagement Letter and became part of the parties' understanding of the basic terms of their arrangement. The crux of the allegedly false statements is that *in the event Defendant filed for bankruptcy protection*, she

---

[22] *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir. 1986), *abrogated on other grounds by Grogan v. Garner*, 498 U.S. at 279; *In re Kukuk*, 225 B.R. at 787 (quoting *In re Black*).  *See also Ritz*, 578 U.S. at 360 (finding the term "actual fraud" denotes "any fraud that "involv[es] moral turpitude or intentional wrong."); *Reddy v. Melnik (In re Melnik)*, 592 B.R. 9, 21 (Bankr. N.D.N.Y. 2018), *aff'd*, No. 3:18-CV-1197, 2019 WL 2766592 (N.D.N.Y. July 2, 2019), *aff'd*, No. 19-2367, 2021 WL 5987010 (2d Cir. Dec. 17, 2021).

[23] *Rice, Heitman & Davis, S.C. v. Sasse (In re Sasse)*, 438 B.R. 631, 645 (Bankr. W.D. Wis. 2010).

[24] *See supra* note 7.

promised to reaffirm any debt for legal fees to Plaintiff and promised "to pay any monies owed from any court ordered disbursement of retirement plans."[25] The Engagement Letter was followed by emails sent from Defendant to Plaintiff in which she affirmed her previous promises to pay the legal fees and that she would not "leave [Plaintiff] high and dry" "even if she were forced to file for bankruptcy."[26] The statements are, in effect, a prospective waiver of Defendant's right to discharge Plaintiff's claim in bankruptcy and a promise to alter Plaintiff's post-bankruptcy rights to recover from Defendant's property.

Prepetition waivers of dischargeability of debt have long been held unenforceable and void as against public policy.[27] They are completely at odds with the underlying purpose of the Bankruptcy Code to provide debtors a "fresh start" in the organization of their financial affairs.[28] These principles apply equally to a promise to exclude particular property from the protections offered by state exemptions laws under the Bankruptcy Code.[29] Defendant could not contract away her right to seek discharge of a particular debt or to alter Plaintiff's collection rights in a future bankruptcy case.[30] At most, the terms of the Engagement Letter represented unenforceable

---

[25] *See* ECF No. 1, at 3 ¶ 12.

[26] ECF No. 17, at 2 ("those statements invoked and reaffirmed the same contractual promise memorialized on the first invoice."); *id*. at 4 ("The Debtor's subsequent communications in 2024 did not create new obligations but reaffirmed existing ones.").

[27] *See, e.g., Bank of China v. Huang (In re Huang)*, 275 F.3d 1173, 1177 (9th Cir. 2002) ("This prohibition of prepetition waiver has to be the law; otherwise, astute creditors would routinely require their debtors to waive."); *In re Pease*, 195 B.R. 431, 433 (Bankr. D. Neb. 1996); *Hayhoe v. Cole (In re Cole)*, 226 B.R. 647 (9th Cir. BAP 1998); *In re Sasse*, 438 B.R. at 645; *In re DB Cap. Holdings, LLC*, 454 B.R. 804, 814-16 (Bankr. D. Colo. 2011)*;Ziegler v. Kline (In re Kline)*, 520 B.R. 168 (Bankr. E.D. Pa. 2014) (domestic relations attorney fees); *In re Saggus*, 528 B.R. 452, 461 (Bankr. M.D. Ala. 2015).

[28] *In re Cole*, 226 B.R. at 654.

[29] *In re Pease*, 195 B.R. at 434 ("The Bankruptcy Code substantively alters the rights and remedies of both debtors and creditors in a most fundamental way.").

[30] *Id*. at 435 ("[A]ny attempt by a creditor in a private pre-bankruptcy agreement to opt out of the collective consequences of a debtor's future bankruptcy filing is generally unenforceable. The Bankruptcy Code pre-empts the private right to contract around its essential provisions[.]").

promises from Defendant regarding the dischargeability of Plaintiff's claim for fees.  Such promises would not have been enforceable in a state court breach of contract action, and are not enforceable here.

Nor will the Court allow creditors to sidestep the policy voiding prepetition waivers of a bankruptcy discharge by declaring those same statements as fraudulent under § 523(a)(2)(A).[31] Such prepetition waivers of rights under the Bankruptcy Code are inappropriate grounds for a fraud claim when the debtor is simply exercising a statutory right.[32] As one court has noted, "[t]urning that unenforceable promise into the basis of a nondischargeability claim would itself seem to undermine the purpose of the code, which is to grant debtors a discharge in all but those few cases in which fraud is clearly proven."[33]  Whether implicit or explicit, the Court would not find any promise to waive discharge of Plaintiff's debt or to give Plaintiff rights to Debtor's property beyond those found in the Bankruptcy Code to be enforceable.  A breach of such a promise is not actionable absent a specific showing of fraud.[34]

## 2. *Plaintiff has not met its burden under § 523(a)(2)(A).*

The second representation made by Defendant was that she had every intention of paying Plaintiff's fees at the time the services were provided.  Such an expression of intention to perform an agreement may be explicit, but it may also be implied merely from the making of the agreement

---

[31] *Marra, Gerstein & Richman v. Kroen (In re Kroen)*, 280 B.R. 347, 352 (Bankr. D.N.J. 2002) ("[I]t would be no small rupture in the policy voiding waivers if an attorney were permitted to assert the waiver as a misrepresentation qualifying the fee-based debt for a § 523(a)(2)(A) exception to discharge. The backdoor to circumventing fresh start policy through 'pre-printed' retainer agreement discharge waivers, would be wide open."); *In re Sasse*, 438 B.R. at 647.

[32] *In re Sasse*, 438 B.R. at 647.

[33] *Id.*

[34] Restatement (Second) of Torts § 530 (1977) (hereinafter "Restatement") ("If the agreement is not enforceable as a contract . . . the recipient still has, as his only remedy, the action in deceit under the rule stated in [Restatement] § 525.").

and the acceptance of its benefits.[35]   Failure to perform a simple agreement to pay for services would, all things being equal, be enforceable in a collection action based on breach of contract in a non-bankruptcy forum. However, once Defendant filed a no-asset case under Chapter 7, that avenue was closed. Plaintiff's only recourse under the Bankruptcy Code lie in actions under § 727(a) or § 523(a).  To that end, Plaintiff asserts a claim of fraud under § 523(a)(2)(A), alleging that Defendant did not, in fact, intend to pay for the legal services at the time they were provided.

Like the United States Supreme Court, we consult the Restatement (Second) of Torts for authority on the common law tort of fraudulent misrepresentation.[36] The Restatement defines the tort of "misrepresentation" as follows:

> One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.[37]

A fraud qualifying as a false representation under § 523(a)(2)(A) requires an explicit, definable statement by the debtor that results in a misrepresentation.[38] In contrast, false pretenses are implied misrepresentations, including material omissions or conduct intended to create and foster a false impression.[39] A false impression has been further defined as "any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in

---

[35] *Id*. § 530 cmt. c.

[36] *Field*, 516 U.S. at 70 & n.9 (citing Restatement §§ 525-36) ("We construe the terms in § 523(a)(2)(A) to incorporate the general common law of torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular State.").

[37] Restatement § 525. *See also In re Kukuk*, 225 B.R. at 783-84.

[38] *Argento v. Cahill (In re Cahill)*, No. 15-72418, 2017 WL 713565, at *6 (Bankr. E.D.N.Y. Feb. 22, 2017).

[39] *William W. Barney, M.D. P.C. Ret. Fund v. Perkins (In re Perkins)*, 298 B.R. 778, 788 (Bankr. D. Utah 2003).

which a creditor is wrongfully induced to extend money or property to the debtor."[40] Both false pretenses and false representation share the elements of materiality, intent to deceive, justifiable reliance, and damage.[41]

Lastly, a claim may be sustained by proving the debtor engaged in "actual fraud." Actual fraud includes all types of frauds that go beyond misrepresentation. It encompasses "any deceit, artifice, trick, or design involving direct or indirect operation of the mind, used to circumvent or cheat another."[42] As the Supreme Court noted, "anything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.'"[43] A claim for actual fraud requires deceit and damage, but may or may not require reliance, depending on the nature of the fraudulent activity.[44]

Plaintiff has alleged that Defendant's actions are actionable under each of the three forms of fraud.

### A. False Representation / False Impression

To establish a claim for false representation or false impression under § 523(a)(2)(A), the claimant must prove by a preponderance of the evidence that: 1) the debtor made a material representation (either explicit or implied); 2) which the debtor knew or strongly suspected was false at the time, i.e., scienter;[45] 3) with the intent to deceive the creditor; 4) the creditor relied on

---

[40] *Bank of Cordell v. Sturgeon (In re Sturgeon)*, 496 B.R. 215, 223 (10th Cir. BAP 2013) (quoting *Stevens v. Antonious (In re Antonious),* 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006)).

[41] *Wells v. Parker (In re Parker)*, No. 11-12329, 2012 WL 7991473, at * 11 (Bankr. S.D. Ohio Apr. 13, 2012).

[42] *In re Sturgeon*, 496 B.R. at 223 n.14 (quoting *McClellan v. Cantrell,* 217 F.3d 890, 893 (7th Cir. 2000)).

[43] *Ritz*, 578 U.S. at 360.

[44] *Id*. at 365-66 ("The Court was not establishing a 'reliance' requirement for frauds that are not premised on such a misrepresentation.") (*discussing Field*, 516 U.S. at 61).

[45] Restatement § 526 cmt. c ("[K]nowledge of falsity is not essential; it is enough that he believes the representation to be false."); *In re Kukuk*, 225 B.R. at 787.

the false representation, i.e., actual reliance;[46] 5) the creditor's reliance was justifiable;[47] and 6) the creditor was damaged as a result.[48]

### a. *Presence of a representation*

There is no doubt Defendant made a representation to Plaintiff. A representation may be one of the debtor's intention to act or refrain from action.[49] When a debtor makes an agreement to pay for the services of a creditor, courts distinguish between a debtor's representation of an *intent to pay* from a representation of *ability to pay*.[50] Only a representation of the former is actionable under subparagraph (A). An implied representation regarding the debtor's *ability to repay* is not grounds for nondischargeability under subparagraph (A) because it specifically excludes "a statement respecting the debtor's or an insider's financial condition[.]"[51] When Defendant hired Plaintiff to represent her in two state court matters, at a minimum she conveyed the impression that she intended to fulfill her side of the agreement and pay Plaintiff for its services.[52] Therefore, the Court finds Defendant made an implied representation that she *intended to pay* Plaintiff's fees at the time they were incurred.

---

[46] *See Field*, 516 U.S. at 70 (citing Restatement § 537).

[47] *Id.* at 74.

[48] *Slack v. Woods (In re Woods)*, 616 B.R. 803, 812 (Bankr. N.D. Okla. 2020); *In re Sturgeon*, 496 B.R. at 222 (citing *Fowler Bros v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996)); *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782 (10th Cir. 2009); *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 398 (5th Cir. 2017).

[49] Restatement § 530(1).

[50] *In re Kukuk*, 225 B.R. at 785; *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998) ("Thus, we hold that the proper inquiry to determine a debtor's fraudulent intent is whether the debtor subjectively intended to repay the debt."); *Anastas v. Am. Savs. Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir. 1996); *First Nat'l Bank of Omaha v. Manriquez (In re Manriquez)*, No. 08-CV-00567, 2009 WL 3015161, at *8 (D. Colo. Sept. 17, 2009).

[51] § 523(a)(2)(A); *In re Kukuk*, 225 B.R. at 785 (emphasis added).

[52] Restatement § 530 cmt. c.

### b.  Absence of scienter

Scienter refers to the maker's knowledge of the untrue character of a representation at the time it is made.[53] When the representation involves the maker's own intention to do or not to do a particular thing, it is fraudulent if they do not have that intention.[54]  Absolute knowledge of falsity is not required; a reckless disregard for the truth of a representation may constitute fraud.[55] "However, 'reckless disregard' should be very narrowly interpreted. The Restatement makes clear that a misrepresentation is fraudulent only if the maker 'knows or believes that the matter is not what he represents it to be.'"[56] A debtor's mere failure to fulfill a promise is not sufficient to render a debt nondischargeable.[57] On the other hand, a debtor's failure to fulfill contractual obligations could make the creditor's claim nondischargeable if the debtor had no intention of performing the obligations under the contract at the time it was entered.[58] According to the Restatement,

> The intention of the promisor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of its nonperformance, nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into.[59]

---

[53] *Id*. §§ 526 cmt. a; 530 cmt. d. ("The intention that is necessary . . . is the intention of the promisor when the agreement was entered into.").

[54] *Id*. § 530(1).

[55] *Id*. § 526 cmt. e; *In re Kukuk*, 225 B.R. at 787.

[56] *In re Kukuk*, 225 B.R. at 787 (quoting Restatement § 526(a)).

[57] *Trinkets and Tea, LLC v. Hunt (In re Hunt)*, 605 B.R. 758, 777 (Bankr. N.D. Tex. 2019); *In re Kountry Korner Store*, 221 B.R. 265, 272 (Bankr. N.D. Okla. 1998) (fraud "must be clearly distinguished from the mere failure to perform a promise, which is not fraud but breach of contract."); *Jack Master, Inc. v. Collins (In re Collins)*, 28 B.R. 244 (Bankr. W.D. Okla. 1983).

[58] *See AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 408 (5th Cir. 2001); *In re Hunt*, 605 B.R. at 777; *Cap. Chevrolet v. Bullock (In re Bullock)*, 317 B.R. 885, 889 (Bankr. M.D. Ala. 2004) ("Representations as to future intentions or promises to perform certain acts in the future generally do not give rise to actionable fraud, unless the defendant had no intent to fulfill the promise at the time of its making.") (citing cases); *In re Kountry Korner Store*, 221 B.R. at 272 ("The contention that the debtor had no actual present intent to ever repay the debt at the time the debt was incurred is an element for which the creditor has the burden of proving by a preponderance of the evidence.").

[59] Restatement § 530 cmt. d.

Likewise,

> To be actionable the statement of the maker's own intention must be fraudulent, which is to say that he must in fact not have the intention stated. If he does not have it, he must of course be taken to know that he does not have it. **If the statement is honestly made and the intention in fact exists, one who acts in justifiable reliance upon it cannot maintain an action of deceit if the maker for any reason changes his mind and fails or refuses to carry his expressed intention into effect.** If the recipient wishes to have legal assurance that the intention honestly entertained will be carried out, he must see that it is expressed in the form of an enforceable contract, and his action must be on the contract.[60]

"A debtor's unreasonably optimistic view that he or she could repay the debt when it was incurred, therefore, does not constitute fraud if the debtor intended to repay the debt when it was incurred."[61] The inquiry for the Court is whether the Defendant, either intentionally or with recklessness as to its truth or falsity, made a misrepresentation regarding her intention to repay the debt.[62]

Defendant testified that at the time she hired Plaintiff, and throughout the duration of her legal cases, she always intended to pay her legal fees. Only when her divorce case was coming to a close, she had received the settlement funds from the divorce, and she had been ordered to pay her ex-husband's legal fees and taxes to the OTC, did Defendant come to the realization that she would be unable to honor her prior commitments. Plaintiff has presented no evidence, beyond the fact of non-payment, that Defendant did not intend to pay the firm's bills, either at the time of their original engagement or during the period when the legal fees were incurred. The Court finds Plaintiff has not met its burden to prove Defendant lacked an intention to pay for the legal services

---

[60] *Id*. § 530 cmt. b (emphasis added).

[61] *In re Kukuk*, 225 B.R. at 788 (citation omitted). *See also Citibank, N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1090 (9th Cir. 1996) ("[H]uman experience tells us debtors can be unreasonably optimistic despite their financial circumstances."); *In re Rembert*, 141 F.3d at 281.

[62] *In re Anastas*, 94 F.3d at 1286.

at the time they were rendered, or that her promises to pay Plaintiff were false at the time they were made.

### c.  *Absence of intent to deceive*

Plaintiff has asked the Court to conduct an "intent analysis" regarding whether Defendant intended to deceive Plaintiff when she engaged the firm to provide legal services.[63] Intent to deceive may be inferred from the totality of the circumstances, and is measured by the debtor's subjective intention at the time a representation was made.[64]  Courts acknowledge that rarely, if ever, will a debtor admit his or her intent to deceive while under oath.[65]  Fraudulent intent must be determined on a case-by-case basis, "with the particular circumstances of the case and the demeanor and credibility of the witness playing a very large role."[66]  Courts are admonished to focus on the circumstances of the particular case, and not a laundry list of factors,  in order evaluate the elements under § 523(a)(2)(A).[67] The utilization of circumstantial evidence may include assessing factors such as the debtor's conduct after incurring the obligation, the debtor's financial sophistication, and whether the debtor failed to make attempts to perform their obligation.[68] Under the preponderance of the evidence standard, the Court must determine whether all the evidence

---

[63] ECF No. 17, at 3. The Court declines Plaintiff's request to conduct a similar analysis regarding Defendant's representation of her *ability to pay*, given that such a representation is not actionable under § 523(a)(2)(A).

[64] *In re Young*, 91 F.3d at 1375; *In re Kukuk*, 225 B.R. at 786; *In re Sturgeon*, 496 B.R. at 222; *In re Woods*, 616 B.R. at 814; *In re Sasse*, 438 B.R. at 645; *In re Parker*, 2012 WL 7991473, at *8.

[65] *In re Woods*, 616 B.R. at 814.

[66] *In re Kukuk*, 225 B.R. at 786; *In re Bullock*, 317 B.R. at 890 n.1 ("A determination of the debtor's fraudulent intent to deceive depends in large measure upon the assessment of the debtor's credibility made by the Court and the demeanor of the particular debtor.").

[67] *Id.* at 787.

[68] *Ewing v. Bissonnette (In re Bissonnette)*, 398 B.R. 189, 194 (Bankr. N.D. Ohio 2008).

leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent.[69]

The Court finds Plaintiff did not prove by a preponderance of evidence that Defendant knowingly made any false representation of future payment to induce future legal services while knowing of a fixed intent to discharge the debt for those services, or that she intended in any way to deceive her counsel prior to completion of their work. First, Defendant testified that she has pursued several graduate degrees and sought better employment options in an effort to increase her income and improve her ability to repay all of her creditors, to no avail.  Second, Defendant hired Plaintiff to represent her when she was involved in a highly contested divorce and another contentious civil matter. It was apparent that Defendant expected to prevail in both matters, and she believed she would have sufficient funds to pay her many debts, including Plaintiff's growing legal fees. Such was not to be. While no evidence was presented of how much Defendant ultimately received from the divorce settlement, it was clearly less than she had anticipated.

When Defendant received her share of the divorce proceeds, she chose to use a portion of those funds to make a downpayment on a new home and begin needed improvements.  Defendant testified that at the time of the home purchase, she still believed she could manage her financial affairs and avoid bankruptcy. After being hit with the unexpected judgment to pay her ex-husband's legal fees, as well as the OTC debt, which together exceeded $150,000, she decided she could no longer keep up. Upon reflection and discussion with bankruptcy counsel, Defendant made the decision to file a petition under Chapter 7. While Defendant's actions may have been at odds with her original intentions and promises, there was no evidence to suggest it was part of a latent scheme or plan by Defendant to avoid paying Plaintiff's fees. It was simply a choice Defendant

---

[69] *In re Rembert*, 141 F.3d at 282.

felt compelled to make after realizing her available resources were insufficient to meet her growing and overwhelming obligations.

Plaintiff attempted to introduce evidence that after filing her bankruptcy petition, Defendant has lived an extravagant lifestyle. The Court found evidence of Defendant's current lifestyle to be irrelevant to this proceeding, given that the Court will not enforce any prepetition waiver of Defendant's right to file bankruptcy or to discharge Plaintiff's claim. To the extent Defendant retained exempt assets or has post-petition income, Defendant is entitled to use those funds as she sees fit.

Plaintiff concedes that Defendant made sporadic payments totaling $950 towards the firm's legal fees. Plaintiff characterized these payments as an effort by Defendant to deter it from instigating a collection action. Although it appears she only began making payments in response to Plaintiff's demands, Defendant testified they were all she could afford at the time, given her limited income and mounting bills. While the intermittent payments barely made a dent in Defendant's legal bills, they belie an intent to acquire legal services without payment.[70] Plaintiff presented no evidence that Defendant engaged in a larger scheme or plan to delay efforts at collection.

The Court found Defendant to be a credible witness. She testified that she fully intended to pay Plaintiff's legal fees, as well as the other debts incurred during her lengthy divorce proceeding, but in the end was unable to do so. Although Defendant holds several advanced degrees in the field of education, the Court did not find her to be particularly financially savvy.

---

[70] *See, e.g., Varble v. Chase (In re Chase)*, 372 B.R. 133, 137 (Bankr. S.D.N.Y. 2007); *Carroll and Sain v. Vernon (In re Vernon)*, 192 B.R. 165, 172-73 (Bankr. N.D. Ill. 1996); *Busch, Inc. v. Grilliot (In re Grilliot)*, 293 B.R. 725, 730 (Bankr. N.D. Ohio 2002) ("In this respect, it is well-established that partial payments on a debt mitigate heavily against a finding of fraudulent intent."); *In re Parker*, 2012 WL 7991473, at *8.

Defendant seemed to assume that the divorce process would result in a favorable settlement, and that her debts, including Plaintiff's, would be resolved along the way. Defendant may have had an overly optimistic understanding of how her divorce and other litigation would proceed, but, applying a subjective standard, the Court does not find any evidence that she intended to deceive or defraud Plaintiff during the course of their engagement.

### d.  Absence of justifiable reliance

The Court has no trouble finding that Plaintiff *actually relied* on Defendant's promise that she would pay her legal fees even if she filed for bankruptcy. But actual reliance is not enough. Plaintiff must also show that her reliance was justifiable.[71] Justifiable reliance is a minimal, subjective standard that encompasses "a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."[72] While justifiable reliance does not obligate a creditor to investigate everything a debtor says, the creditor may not "blindly" rely upon a misrepresentation which could have been proven false through a "cursory examination or investigation."[73] If the surrounding circumstances raise red flags, or if the creditor's own capacity and knowledge would justify further investigation, a duty to investigate may arise.[74]

Numerous cases have addressed the reliance of a law firm on a client's promise to pay for services when the lawyer had reason to doubt the client's *ability to pay* in the future.[75] Often this

---

[71] *Field*, 516 U.S. at 70 (noting that both actual and "justifiable" reliance are required under § 523(a)(2)(A)) (citing Restatement § 537).

[72] *Id.* at 71. *See also In re Perkins*, 298 B.R. at 792.

[73] *In re Sasse*, 438 B.R. at 650 (citing *Field*, 516 U.S. at 71).

[74] *Id*.

[75] *See, e.g., In re Chase*, 372 B.R. 138-39 (divorce and child custody counsel); *In re Kroen*, 280 B.R. at 354 (divorce counsel); *In re Vernon*, 192 B.R. at 172-73 (divorce counsel); *In re Sasse*, 438 B.R. at 650 (criminal defense counsel); *In re Parker*, 2012 WL 7991473, at *10 (divorce counsel).

reliance is bound up with the creditor's misguided belief that its client's prepetition waiver of a bankruptcy discharge will be enforced. Here, Plaintiff indicated that even before the firm began to incur legal fees, Reed was concerned about Defendant's ability to eventually pay those fees.[76] Reed suggested that early in their relationship, Defendant had asked for a referral to a bankruptcy attorney.  Instead of asking for a retainer or taking a security interest or lien on property, Plaintiff simply extracted an unenforceable promise from Defendant to waive her right to discharge the debt in bankruptcy.  As the years went on and Plaintiff's concerns mounted, the firm still made no effort to extract any form of security from Defendant, beyond the promises to pay its fees.

Throughout the duration of their legal engagement, Defendant made no effort to hide her mounting financial struggles from Plaintiff.  In the 2024 emails, Defendant outlined her litany of financial struggles before concluding with statements that, despite those many struggles, she would still try to honor her obligations to Plaintiff.  The Court notes that Plaintiff's final charges for legal fees were made on March 8, 2024, before either of the 2024 emails.  Therefore, Plaintiff cannot be said to have relied on statements made in those emails to provide additional services.  Plaintiff also suggests the 2024 emails were designed to dissuade Plaintiff from pursuing collection of its legal fees, which was the equivalent of an extension of credit. If Plaintiff resisted filing a collection action against Defendant, the Court finds it did so for its own self-interested reasons; it did not credibly rely on Defendant's promises of repayment.

The Court finds that Plaintiff had concerns about Defendant's financial circumstances from the beginning of their relationship, which should have served as a "red flag" necessitating further investigation about Defendant's ability to pay her future legal fees.[77]  It was incumbent on Plaintiff

---

[76] *See* ECF No. 1, at 3 ¶ 12.

[77] *See In re Vernon*, 192 B.R. at 173 ("[I]mprovident creditors are not to be afforded special protections in bankruptcy for the assumption of common business risks.").

to recognize the inherent financial risk of litigating a highly contested divorce, even if Defendant did not fully appreciate the risk involved.  Instead of taking prudent steps to protect its financial exposure, Plaintiff ignored all the red flags and instead chose to rely on Defendant's unenforceable promises of prepetition waiver of rights to bankruptcy relief. As Defendant repeated the unenforceable waivers of bankruptcy protection, Plaintiff's reliance on those promises became increasingly untenable. The Court finds such reliance was not justifiable.

In summary, the Court finds Defendant made representations during and throughout their engagement that she intended to pay Plaintiff's fees for legal services. Plaintiff has not met her burden to prove that the representations were falsely made with the intent to deceive and induce reliance.  There is no evidence to suggest Defendant did not intend to pay for Plaintiff's services at the time they were rendered.  The fact that she subsequently determined she could or would not pay for those services is not determinative.[78]  Nor has Plaintiff established that it justifiably relied on Defendant's representations. Therefore, the Court holds that this debt will not be excepted from discharge under either the "false representation" or "false pretenses" prongs of § 523(a)(2)(A).

## B.  Actual Fraud

In addition to frauds that involve a representation, § 523(a)(2)(A) can also apply to frauds that involve a scheme or deception that does not involve a direct representation.[79] Although Plaintiff's closing brief includes a reference to actual fraud, it does not indicate any claim beyond those involving the direct or implied representations discussed above.  For the reasons discussed, the Court finds no evidence that Defendant intended to deceive Plaintiff when she hired the firm to represent her in her legal affairs. Accordingly, Plaintiff has not met its burden to prove a claim

---

[78] *See supra* text accompanying note 57; Restatement § 530 cmts. b, d.
[79] *Ritz*, 578 U.S. at 366.

of actual fraud under § 523(a)(2)(A).

### Conclusion

For the foregoing reasons, the Court concludes that Plaintiff has failed to prove the elements of a claim of false representation, false pretenses, or actual fraud under § 523(a)(2)(A). To be clear, nothing in the Bankruptcy Code prevents Defendant from honoring her promises and voluntarily repaying this debt, but she is under no legal obligation to do so.[80] A separate order consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 12th day of January, 2026.

BY THE COURT:

PAUL R. THOMAS, CHIEF JUDGE
UNITED STATES BANKRUPTCY

---

[80] *See* § 524(f).